# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
Docket No. 23-12580

---

ECB USA, INC. AND ATLANTIC VENTURES CORP.,

*Plaintiffs-Appellants*,

v.

SAVENCIA CHEESE USA, LLC, ET AL.,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the Southern District of Florida
District Court Case No. 1:20-cv-21681-AHS

---

## APPELLANTS' INITIAL BRIEF

---

Dated: October 18, 2023

Respectfully submitted,

/s/ Joel S. Magolnick
Joel S. Magolnick, Esq.
**MARKO & MAGOLNICK, P.A.**
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: (305) 285-2000
Facsimile: (305) 285-55555
magolnick@mm-pa.com

Counsel for Appellants

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Appellants ECB USA, Inc. and Atlantic Ventures Corp. submits the following Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1-1 and 26.1-2 of the Rules of the United State Court of Appeals for the Eleventh Circuit:

1. Akerman, LLP (Counsel for Appellants)

2. Atlantic Ventures Corp. (Appellant)

3. Bongrain, Alex (Appellee)

4. Bloom, Margot (Counsel for Appellees)

5. Brown, Troy (Counsel for Appellees)

6. Coates, Melissa M. (Counsel for Appellees)

7. ECB USA, Inc. (Appellant)

8. Gitlin, Lewis (Appellee)

9. Glasser, Jennifer (Counsel for Appellants)

10. Kim, Su Jin (Counsel for Appellees)

11. Kirkpatrick, John E. (Counsel for Appellants)

12. Magolnick, Joel S. (Counsel for Appellants)

13. Marko & Magolnick, P.A. (Counsel for Appellants)

14. Marston, David W. (Counsel for Appellees)

15. Miller, Zachary D. (Counsel for Appellees)

16. Morgan, Lewis & Bockius, LLP (Counsel for Appellees)

17. Morris, Brian F. (Counsel for Appellees)

18. Ragnet, Pierre (Appellee)

19. Roman, Ryan (Counsel for Appellants)

20. SARL Ets. Claude Blandin & Fils (Parent of Appellant ECB USA, Inc.)

21. Savencia Cheese USA, LLC (Appellee)

22. Savencia, S.A., BNGRF (Ultimate Parent of Appellee Savencia Cheese USA, LLC)

23. Singhal, Raag (United States District Judge)

24. Swartele, Thomas (Appellee)

25. Wild, J. (Appellee)

26. Zausner Foods Corp. (Parent of Appellee Savencia Cheese USA, LLC)

/s/ Joel S. Magolnick
Joel S. Magolnick

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... vii

STATEMENT REGARDING ORAL ARGUMENT ............................................. ix

JURISDICTIONAL STATEMENT ........................................................................x

STATEMENT OF THE ISSUES..............................................................................1

I.   OVERVIEW .....................................................................................................3

II.  STATEMENT OF THE CASE .........................................................................4

     A.   Course of Proceedings.............................................................................4

     B.   Statement of the Facts .............................................................................5

          1.   The Parties......................................................................................5

          2.   Background and Transaction ...................................................7

          3.   The Individual Defendants Directed Tortious Acts at
              Florida .........................................................................................15

III. STANDARD OF REVIEW ...........................................................................20

IV.  SUMMARY OF THE ARGUMENT .............................................................20

V.   ARGUMENT .................................................................................................23

     A.   The District Court Erred in Holding that the Individual  Defendants
        Were Not Subject to Personal Jurisdiction Under the Florida Long-
        Arm Statute for Having Committed, and/or Conspired to Commit,
        Torts in Florida...................................................................................23

          1.   The Florida Long-Arm Statute Provides for Specific

i

Jurisdiction Over the Individual Defendants, who Committed Tortious Acts in Florida ..........................................................23

2.    The Commission of an Intentional Tort in Florida as a Basis for Personal Jurisdiction Satisfies the Due Process Clause ....36

B.    THE DISTRICT COURT ERRED IN DISMISSING THE SUBSTANTIVE CLAIMS AGAINST SAVENCIA CHEESE FOR FAILURE TO STATE A CLAIM ...................................................42

1.    The ECB Parties Alleged a Claim for Conspiracy ................42

2.    The ECB Parties Alleged a Claim for Aiding and Abetting a Breach of Fiduciary Duty........................................................47

3.    The ECB Parties Alleged a Claim for Tortious Interference with Contract..........................................................................50

VI.  CONCLUSION ................................................................................52

CERTIFICATE OF COMPLIANCE.......................................................53

CERTIFICATE OF SERVICE ...............................................................53

# TABLE OF AUTHORITIES

**Cases**                                                                             **Page(s)**

*Altimas v. Whitney*,
209CV682FTM36SPC, 2010 WL 11507317 (M.D. Fla. Dec. 9, 2010) .............43

*Andrew H. Boros, P.A. v. Arnold P. Carter, M.D., P. A.*,
537 So. 2d 1134 (Fla. 3d DCA 1989) ....................................................................27

*Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*,
144 F.3d 732 (11th Cir. 1998) ................................................................................48

*Buckner v. Lower Florida Keys Hospital District*,
403 So. 2d  (Fla. 3d DCA 1982) ..........................................................................42

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ................................................................................................40

*Cruise v. Graham,*
622 So. 2d 37 (Fla. 4th DCA 1993) ........................................................... 27, 29, 41

*Del Valle v. Trivago GMBH*,
56 F.4th 1265 (11th Cir. 2022) .................................................................... passim

*Estate of Scutieri v. Chambers*,
386 Fed. App'x 951 (11th Cir. 2010) ....................................................................29

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
752 So. 2d 582 (Fla. 2000) ........................................................................... 26, 31

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
141 S. Ct. 1017 (2021) ............................................................................................40

*Hogan v. City of Fort Walton Beach*,
817 Fed. Appx. 717 (11th Cir. 2020) ....................................................................20

*Internet Sols. Corp. v. Marshall*,
39 So. 3d 1201 (Fla. 2010) .......................................................... 24, 25, 28, 29

iii

*Israel v. Bellsouth Telecommunications, Inc.*,
  12-60806-CIV, 2012 WL 12862809 (S.D. Fla. July 10, 2012)...........................34

*Joseph v. Norman LaPorte Realty, Inc*.,
  508 So. 2d 496 (Fla. 3d DCA 1987)......................................................................27

*Julisa, LLC v. Avers*,
  20-23203-CIV, 2020 WL 13267753 (S.D. Fla. Nov. 4, 2020)...........................35

*Kates v. Millheiser*,
  569 So. 2d 1357 (Fla. 3d DCA 1990)...................................................................27

*Landmark Bank, N.A. v. Cmty. Choice Fin., Inc.*,
  No. 17-60974, 2017 WL 4310754 (S.D. Fla. Sept. 28, 2017)............................26

*Licciardello v. Lovelady*,
  544 F.3d 1280 (11th  Cir. 2008) ................................................................. 1, 25, 38

*Louis Vuitton Malletier, S.A. v. Mosseri*,
  736 F.3d 1339 (11th Cir. 2013) ............................................................... 24, 25, 39

*N.R. by Ragan v. Sch. Bd. of Okaloosa Cty*., *Fla.*,
  418 F. Supp. 3d 957 (N.D. Fla. 2019) ........................................................... 35, 36

*Okeda de Mexico, S.A. de C.V. v. Heras*,
  04-23168-CIV, 2005 WL 8155961 (S.D. Fla. May 5, 2005) ..............................42

*Perlman v. Wells Fargo Bank, N.A*.,
  559 Fed Appx. 988 (11th Cir. 2014)....................................................................46

*Peters v. Amoco Oil Co.*,
  57 F. Supp. 2d 1268 (M.D. Ala. 1999).................................................................42

*Posner v. Essex Ins. Co.*,
  178 F.3d 1209 (11th Cir. 1999) ............................................................................25

*Raimi v. Furlong*,
  702 So. 2d 1273 (Fla. 3d DCA 1997)...................................................................42

iv

*Resnick v. AvMed, Inc.*,
   693 F.3d 1317 (11th Cir. 2012) .............................................................42

*Sculptchair, Inc. v. Century Arts, Ltd.*,
   94 F.3d 623 (11th Cir. 1996) ................................................................23

*Soho Ocean Resort TRS, LLC v. Rutois*,
   21-11392, 2023 WL 242350 (11th Cir. Jan. 18, 2023) ................................ 50, 51

*Trans Am Worldwide, LLC v. JP Superior Sols., LLC*,
   No. 4:17cv560–MW/CAS, 2018 WL 3090394 (N.D. Fla. Apr. 30, 2018) .........30

*United Technologies Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ........................................................ 2, 26, 31

*Wendt v. Horowitz*,
   822 So. 2d 1252 (Fla. 2002) .................................................................24

*Wilcox v. Stout*,
   637 So. 2d 335 (Fla. 2d DCA 1994) ......................................................31

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ...........................................................................39

**Statutes**

28 U.S.C. § 1291 .................................................................................. ix

28 U.S.C. § 1331 .................................................................................. ix

28 U.S.C. § 1332(a)(1) .......................................................................... ix

Section 48.193 ....................................................................................24

Section 48.193(1) ................................................................................24

Section 48.193(1)(a)(2), Florida Statutes ....................................... passim

Section 48.193(1)(b) ............................................................................24

v

**Rules**

Federal Rule of Appellate Procedure 32(a)(7)(B) ....................................................52

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) ...........................................52

Federal Rule of Civil Procedure 8(a).........................................................................42

Federal Rule of Civil Procedure 9(b)................................................................ 42, 43

Federal Rules of Appellate Procedure and Rule 26.1-1 and 26.1-2 ........................2

Rule 8 and 9 of the Federal Rules of Civil Procedure .................................... 22, 43

Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure..............................52

Rule 32(a)(6) of the Federal Rules of Appellate Procedure ...................................52

## PRELIMINARY STATEMENT

The following terms used in Appellants' Initial Brief have the meaning set forth below:

"Atlantic Ventures" means Appellant Atlantic Ventures, Corp.

"Bongrain" means Appellee Alex Bongrain.

"Corman" means Corman Ship Supply, LLC.

"ECB Parties" means, collectively, ECB USA and Atlantic Ventures.

"ECB USA" means Appellant ECB USA, Inc.

"Freeman" means non-party Richard Freeman, Esq.

"Leoni" means non-party Arno Leoni.

"Gitlin" means Appellee Lewis Gitlin.

"Individual Defendants" means, collectively, Bongrain, Gitlin, Ragnet, Swartele, and Wild.

"Ragnet" means Appellee Pierre Ragnet.

"Savencia" means non-party Savencia, S.A., the ultimate parent of Savencia Cheese.

"Savencia Cheese" means Appellee Savencia Cheese USA, LLC.

"Savencia Companies" means Savencia Cheese, Zausner, ZNHC, and Savencia.

"Schratter" means non-party Schratter Foods Incorporated.

"Secret Letter Agreement" means the June 30, 2014 letter agreement with Voss.

"SPA" means the stock purchase agreement dated December 8, 2014.

vii

"Swartele" means non-party Thomas Swartele.

"Voss" means non-party Alain Voss.

"Wild" means Appellee J. Wild.

"Zausner" means non-party Zausner Foods Corp.

"ZNHC" means non-party ZNHC, Inc.

The record below is cited as "DE [number] at [number]," referring to the docket entry number in the district court and the CM/ECF page number. In the case of the Amended Complaint, the record cite will be "DE 31, ¶ [number].

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument because the district court committed numerous legal errors and disregarded the facts alleged in the Amended Complaint, DE 31, which establish personal jurisdiction. Similarly, in finding that the Amended Complaint failed to state a claim, the district court ignored the detailed factual allegations in the Amended Complaint and failed to draw all inferences in favor of the non-moving parties (Plaintiffs-Appellants). Oral argument will assist the Court in framing, clarifying, and deciding the issues on appeal.

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of Florida had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(1). On April 12, 2023, the district court entered an order dismissing the claims against Alex Bongrain ("Bongrain"), Lewis Gitlin ("Gitlin"), Pierre Ragnet ("Ragnet"), Thomas Swartele ("Swartele"), and J. Wild ("Wild") (collectively, "Individual Defendants") for lack of personal jurisdiction. DE 124. On July 10, 2023, the district court entered an order dismissing the claims against Savencia Cheese USA, LLC ("Savencia Cheese") under Rule 12(b)(6). DE 127. ECB USA, Inc. ("ECB USA") and Atlantic Ventures Corp. ("Atlantic Ventures") (collectively, the "ECB Parties") filed a timely notice of appeal on August 8, 2023. DE 128. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the Individual Defendants were subject to personal jurisdiction in Florida, under Section 48.193(1)(a)(2), Florida Statutes, because the Individual Defendants, along with Savencia Cheese, committed, and/or conspired to commit, intentional torts aimed at the ECB Parties (both Florida corporations) in Florida and who suffered harm in Florida by: (a) the electronic transmission of fraudulent information and misrepresentations into Florida; (b) the creation of a data room containing documents with misrepresentations designed to be accessed from Florida and which were accessed from Florida; and (c) the commission of intentional torts outside of Florida that caused injury to the ECB Parties in Florida.

Whether such intentional torts satisfy the requirements of both the Florida long-arm statute and the due process clause of the U.S. Constitution under the established precedent of *Licciardello v. Lovelady*, 544 F.3d 1280, 1287–88 (11th Cir. 2008).

Whether the district court erred, both factually and legally, in ruling on a motion to dismiss that there could be no actionable conspiracy because "the Individual Defendants and the alleged non-party conspirators were employed by related companies," DE 124 at 6, when: (a) from January 1, 2015 forward, one of the co-conspirators, Alain Voss ("Voss"), was not an agent or employee of any of the various corporate members of the conspiracy; and (b) prior to January 1, 2015,

co-conspirator Voss had a "personal stake" in committing the wrongful acts by seeking (i) to obtain a 45 percent interest in the shares of Schratter Foods Incorporated ("Schratter"),  and (ii) to be appointed as president and a director of Atlantic Ventures, and employed as the CEO/president of Schratter; and (c) there is no allegation or evidence that the various corporate members of the conspiracy stand in a parent-subsidiary relationship.

Whether each Individual Defendant is subject to jurisdiction in Florida because other co-conspirators undertook an act in furtherance of the conspiracy in Florida pursuant to the precedent in *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009).

Whether the district court also erred in dismissing the substantive conspiracy claims against Savencia Cheese for failure to state a claim.

Whether the district court also erred in dismissing the claim for aiding and abetting a breach of fiduciary duty against Savencia Cheese for failure to state a claim.

Whether the district court also erred in dismissing the claim for tortious interference with contract against Savencia Cheese for failure to state a claim.

## I.    OVERVIEW

This is an appeal of the district court's dismissal of the ECB Parties' action arising from fraudulent and other tortious acts in Florida related to the ECB Parties' purchase and operation of Schratter. The district court entered two orders dismissing the case. **First**, the district court dismissed the Individual Defendants for lack of personal jurisdiction. DE 124. **Second**, the district court dismissed the substantive claims against Savencia Cheese for failure to state a claim. DE 127. Both orders ignore the detailed facts alleged in the Amended Complaint and inferences that arise therefrom. DE 31.

The jurisdictional order, DE 124, ignores allegations that the Individual Defendants committed their torts by intentionally directing fraudulent communications into Florida by telephone, email, and an online internet-based data room intended to be accessed from Florida and was, in fact, accessed from Florida. The district court also ignored the allegations in the Amended Complaint demonstrating that the transaction was structured around Florida, and the parties intended to close in Florida, escrowed both the purchase proceeds and the signed transaction documents in Florida, and delivered both the purchase proceeds and signatures from Florida. Moreover, the district court also ignored the allegations in the Amended Complaint that the torts continued in Florida after closing, on December 31, 2014, through April 2017.

3

The Rule 12(b)(6) order, DE 127, is also in error because it ignores the highly detailed factual allegations of the Amended Complaint that far exceed the notice pleading requirements in the Federal Rules of Civil Procedure and U.S. Supreme Court precedent.

This Court should reverse both orders.

## II.    STATEMENT OF THE CASE

### A.    Course of Proceedings

The ECB Parties filed an initial complaint on April 22, 2020. DE 1. While motions to dismiss were pending, the ECB Parties filed the Amended Complaint, DE 31, which states claims for fraud against the Individual Defendants (Counts I and II); conspiracy to commit fraud against all Defendants (Count III); aiding and abetting a breach of fiduciary duty against all Defendants (Count IV); conspiracy to commit a breach of fiduciary duty against all Defendants (Count V); conspiracy to commit constructive fraud against all Defendants (Count VI); and tortious interference against Savencia Cheese (Count VII). DE 31 at ¶¶ 162-224.

The Amended Complaint alleges that the Individual Defendants are subject to specific personal jurisdiction under Fla. Stat. § 48.193(1)(a)(2) because they committed, or conspired to commit, tortious acts in Florida. The ECB Parties did not allege general jurisdiction over the Individual Defendants. DE 31.

On August 17, 2020, the Individual Defendants moved to dismiss for lack of

personal jurisdiction. DE 41. The Individual Defendants, however, did not submit declarations contradicting the specific allegations in the Amended Complaint. Instead, the Individual Defendants filed declarations denying general contacts with Florida, *i.e.,* they do not reside, work, own, or lease property in Florida. DE 41-1, 41-2, 41-3, 41-4, and 41-5.

On August 17, 2020, Savencia Cheese filed a motion to dismiss the Amended Complaint for failure to state a claim. DE 42.

On April 12, 2023, the district court dismissed the Individual Defendants for lack of personal jurisdiction stating that the Amended Complaint did not allege facts showing that: (a) torts were committed in Florida; and (b) their claims arose out of the Individual Defendants' contacts with Florida. DE 124 at 6.

On July 10, 2023, the district court dismissed the substantive claims against the remaining defendant, Savencia Cheese, with prejudice, for failure to state a claim based on pleading insufficiencies. DE 127.

The ECB Parties timely filed a notice of appeal of both orders. DE 128.

## B.    Statement of the Facts

### 1.    The Parties

The ECB Parties are Florida corporations with their principal place of business in Miami, Florida. DE 31, ¶¶ 4, 5.

The Individual Defendants are not residents of Florida. They were senior

5

officers of various members of a multinational food conglomerate, *id*., ¶¶ 6-10, headed by Savencia, S.A. ("Savencia"). *Id*., ¶ 12.

Savencia Cheese is an affiliate of Savencia and Zausner Foods Corp. ("Zausner"). *Id*., ¶ 11. Defendant J. Wild ("Wild") was group chief financial officer for the North American affiliates of the Savencia Companies, which include, among other companies, Zausner, ZNHC, Inc. ("ZNHC"), and Savencia Cheese. *Id*., ¶ 8. Defendant Lewis Gitlin ("Gitlin") was chief legal officer of the North American affiliates of the Savencia Companies. *Id*., ¶ 10. Defendant Tom Swartele ("Swartele") was a director of Savencia and several of its affiliates. *Id.,* ¶ 9. Defendant Alex Bongrain ("Bongrain") was global Chairman of Savencia and its various North American affiliates. *Id.,* ¶ 6. Defendant Pierre Ragnet ("Ragnet") was president of Zausner and Secretary General of Savencia. *Id.,* ¶ 7.

In addition, non-party co-conspirator Alain Voss ("Voss") was the CEO/president of Schratter until June 2014. Afterwards, Voss was a fiduciary of the ECB Parties and an officer and director of Atlantic Ventures and Schratter. *Id*., ¶ 15. Voss acted as the Individual Defendants' and the Savencia Companies' "inside man" within the ECB Parties' organizations (Schratter and Atlantic Ventures), while serving the interests of the conspiracy. *Id*., ¶ 15.

Schratter was a distributor of cheese and other dairy products manufactured by the Savencia Companies. *Id*., ¶¶ 19, 20. Savencia Cheese sold those products to

6

Schratter. *Id.,* ¶ 11.

### 2.     Background and Transaction

Over twenty years ago, Savencia and Voss purchased Schratter. *Id.* at *5*. Until June 30, 2014, a Savencia affiliate owned 75 percent of Schratter's shares and Voss, through his company Voss Enterprises Inc. ("VEI"), owned the other 25 percent. *Id.,* ¶¶ 21, 22. Until June 30, 2014, Voss was Schratter's CEO/president. *Id.,* ¶ 21.

In late June 2014, ZNHC purchased Voss's interest in Schratter for $3 million and stripped him of his offices and authority at Schratter while maintaining his salary. *Id.,* ¶¶ 47, 48, 57.

In the months before June 30, 2014, Voss and the other co-conspirators (including Savencia Cheese) entered into an agreement to: (i) strip Schratter of its assets and sell the remaining portion to an unwitting victim (ultimately the ECB Parties); (ii) strip Voss of his corporate offices and authority, while at the same time fraudulently holding him as the extant CEO/president of Schratter; (iii) make misrepresentations to sell Schratter at an inflated price; and (iv) take such further action to harm Schratter, and any ultimate purchaser of Schratter, for the benefit of the Savencia Companies. *Id.,* ¶ 40. The further actions included undermining the valuable rights to discounts secured by the ECB Parties in the Stock Purchase Agreement ("SPA") for the purchase of Schratter *Id.,* ¶¶ 144-51.

In addition to paying Voss $3 million for his worthless shares, the Individual Defendants also secured Voss's cooperation in the conspiracy by agreeing to pay Voss millions of dollars in the event that he was able to sell Schratter or its subsidiary Corman Ship Supply, LLC ("Corman"). *Id.*, ¶ 57.

As part of the conspiracy, Voss agreed to serve as the fictitious CEO/president of Schratter even though he had, in fact, been stripped of all duties and offices. *Id.*, ¶ 47. All co-conspirators agreed to misrepresent that Voss was the competent, extant, autonomous CEO/president of Schratter, with the full authority and day-to-day control over Schratter, and that he had the complete trust, confidence, and support of the Savencia Companies and the other co-conspirators. *Id.*, ¶¶ 28, 42, 43, 44, 65, 71, 72, 94, 163, 171.

As part of the initial phase of the conspiracy, and in violation of Schratter's organizational documents, the Individual Defendants seized day-to-day operational control and complete corporate control of the affairs of Schratter. *Id.*, ¶ 39.

On June 30, 2014, Voss and Bongrain entered the Secret Letter Agreement, in which it was agreed that Voss would be held out as Schratter's CEO/president, while divesting him of virtually all authority for said positions and giving those duties and authority to Wild. *Id.*, ¶ 47. The existence of the Secret Letter Agreement was not secret – its contents were.

8

The Secret Letter Agreement explains:

> The parties understand that, in view of [Voss's] history with [Schratter], the title President/Chief Executive Officer (other than as it applies to [Schratter's] Corman Shipping Supplies Division) is mainly to enhance the effectiveness of Employee's sales efforts.
>
> ***All other aspects of the operation of [Schratter] shall be the responsibility of J. Wild, who although carrying the title of Executive Vice President, will have the de facto position of Chief Executive Officer.*** These responsibilities shall include, but not be limited to:
>
> 1. Finance
> 2. Human Resources
> 3. Quality
> 4. Information Systems
> 5. All other corporate functions.

*Id.*, ¶ 48 (Emphasis added).

To conceal the deceit, Defendants required Voss to sign a confidentiality agreement regarding the terms to remain secret. *Id.*, ¶ 50. The confidentiality agreement was executed by Gitlin, general counsel for Savencia Cheese, and is attached to the Secret Letter Agreement. *Id.* In sum, while Voss was being held out as the longstanding, trusted, competent CEO of Schratter, *id.*, ¶ 28, in reality, Schratter's management was taken over by a group comprised of the most senior management of the Savencia Companies, including Bongrain (chairman and controlling shareholder of Savencia), Ragnet (president of Zausner and Secretary General of Savencia), Wild (CFO of the North American affiliates, including

Savencia Cheese), and Gitlin (chief legal officer and secretary of same). *Id.*, ¶ 54. Together, they shared corporate and operational control of Schratter for the period beginning in June 2014 through the end of 2014 for the purpose of implementing the conspiracy. *Id.*, ¶ 39.

All the way through the transaction and after, the Individual Defendants lied to the ECB Parties that Voss was the autonomous CEO/president of Schratter, with day-to-day operational control over Schratter, who had the full confidence and support of the Individual Defendants and the Savencia Companies, despite having previously stripped him of his offices and authority. *Id.*, ¶¶ 65, 66, 68, 71, 86, 87, 90, 91. In furtherance of the conspiracy, Voss also made the same misrepresentations. *Id.*, ¶¶ 73, 94, 121.

As part of inducing the ECB Parties into the transaction and closing, the Individual Defendants committed to disclose all material facts about Schratter, representing to the ECB Parties and their professional advisors that all pertinent documents had been uploaded into a virtual data room and that the documents were complete, accurate, and truthful. *Id.*, ¶ 81. It was explicitly understood that the ECB Parties and their professionals would be given online access to the data room for the purpose of conducting due diligence. *Id.*, ¶¶ 75-76. Nevertheless, and in direct contradiction to their commitment to be fully transparent, the Individual Defendants concealed the terms of the Secret Letter Agreement before and after the Schratter

purchase. *Id.*, ¶¶ 50, 55, 56. Of course, if the Individual Defendants had disclosed that Voss had been stripped of all his authority, the deal would never have closed. *Id.*, ¶¶ 66-68, 160, 165, 171, 173.

The Individual Defendants controlled the documents in the data room. *Id.*, ¶ 76. Gitlin and Ragnet caused to be included in the data room two documents that misrepresented the management structure of Schratter. *Id.*, ¶ 86. The first document was a list of Schratter's directors and officers, identifying Voss as CEO/president. *Id.* The list made no mention of Wild. *Id.* The second document was a management chart that identified Voss as the CEO/president and only identifies Wild as the executive vice president. *Id.*

The Defendants also misrepresented Voss's role at Schratter in the signed letter of intent sent by Gitlin to Richard Freeman ("Freeman") in Florida. *Id.,* ¶¶ 87-89. Freeman was counsel for the buyer group, including the ECB Parties. *Id.,* ¶ 78. All versions of the letter of intent misrepresent that Schratter was "owned by Seller but managed on a day-to-day basis by [Voss]… in his role as Company President/CEO." *Id.,* ¶ 90. The letter of intent was prepared and executed by Gitlin and Voss. *Id.*, ¶ 89.

Schratter's corporate books made no reference to the terms of the Secret Letter Agreement. *Id.*, ¶ 55. There was no board or shareholder resolution authorizing or adopting the Secret Letter Agreement or referring to the fact that Voss had been

stripped of his duties. *Id*. State corporate filings did not reflect the changes in authority. *Id*.

The misrepresentations regarding Voss and his roles were important because the Individual Defendants and the Savencia Companies understood that the ECB Parties did not have any experience in the cheese distribution business and, if they were to buy Schratter, they would have had to do so with Schratter's senior management in place. *Id.,* ¶ 27. Moreover, the Individual Defendants and the Savencia Companies understood that the senior management of the ECB Parties, French nationals, did not have permission to work in the United States. *Id*.

Knowing the foregoing, the Individual Defendants encouraged the ECB Parties to accept Voss as a fiduciary and a partner, appoint him as president and director of Atlantic Ventures, and "retain" him as CEO/president of Schratter. *Id.*, ¶¶ 29, 73, 95, 159, 182, 190, 203.

ECB USA was incorporated on December 5, 2014. The next day, ECB USA, together with Voss and his company, VEI, signed the SPA with ZNHC for the purchase of 100 percent of Schratter's shares for $27 million, payable as follows: $2 million at closing; $15 million six months later; and $10 million over the next four years. *Id*., ¶ 115. Four days later, on December 9, 2014, VEI and ECB USA formed Atlantic Ventures. The purpose of Atlantic Ventures was to serve as the holding company for Schratter. *Id.*, ¶ 116. At that time, Atlantic Ventures was owned 55

12

percent by ECB USA and 45 percent by VEI, Voss's company. *Id.* Prior to closing, ECB USA and VEI assigned their rights in the SPA to Atlantic Ventures, which purchased Schratter. *Id*. Relying on the Individual Defendants' misrepresentations, the ECB Parties took Voss as a fiduciary, *id*., ¶¶ 94-95, partnered with Voss to purchase Schratter (Voss became an indirect 45percent owner through VEI), retained Voss as Schratter's CEO/president and appointed him a director of Schratter, *id*., ¶ 95, and appointed Voss as president and a director of Atlantic Ventures, *id*.

From January 1, 2015, until his termination in 2017, Voss was no longer affiliated with the Savencia Companies, except as a co-conspirator: he was employed by Schratter (then owned by the ECB Parties) and an officer and director of Atlantic Ventures (then owned by the ECB Parties and VEI). DE 53-1, ¶¶ 13-14.

The significant benefits received by Voss to establish Voss's "personal stake" include receiving equity in Schratter (45 percent) and being appointed president and director of Atlantic Ventures and subsequently CEO/president of Schratter under the post-acquisition structure. DE 31, ¶¶ 94-95. All of these were personal to Voss and not part of his duties as the "putative" CEO/president of Schratter under the pre-acquisition structure, while it was still owned by the Savencia Companies.

Before and after closing, as of December 8, 2014, as president and a director of Atlantic Ventures, Voss owed a fiduciary duty to both Atlantic Ventures and its

13

shareholders, including ECB USA. *Id*., ¶¶ 15, 29, 73, 95, 128, and 159. After closing, from January 1, 2015, in his position as CEO/president of Schratter, Voss owed a fiduciary duty to Schratter's sole shareholder Atlantic Ventures. *Id.*, ¶¶ 15, 29, 33, 73, 128, 159, 166, 182. In these positions, the Individual Defendants knowingly joined Voss, a fiduciary, in a conspiracy to breach Voss's duties to the ECB Parties, *id.,* ¶¶ 96, 97, to defraud the ECB Parties into purchasing and funding Schratter, *id.,* ¶¶ 24, 28-30, 33, 125, 182, to cover and conceal their misdeeds, *id*., ¶¶ 114, 120, 128-30, 143, 147, 151-53, and to undermine the 10 percent discount secured in the SPA, *id.,* ¶¶ 36, 39, 146-47, 187, 194, 220. Voss violated his duties to the ECB Parties and protected the interests of the Individual Defendants and their co-conspirators. *Id*., ¶ 120. Co-conspirator Voss remained in his positions with Atlantic Ventures and Schratter until 2017. *Id*., ¶¶ 155-56.

Commencing in early 2015, Schratter moved its headquarters to Miami, Florida. *Id*., ¶¶ 62, 97. During the period when Schratter was headquartered in Miami, and until his termination, Voss continued to work on behalf of the conspiracy while pretending to act in the best interest of the ECB Parties. *Id*., ¶¶ 97, 191. For two-and-a-half years after the closing of the sale of Schratter, Voss continued to commit wrongful acts from Florida designed to continue and conceal the frauds by the Individual Defendants and Savencia Cheese and to undermine the deal that the ECB Parties had made with Zausner. *Id*., ¶ 97. These actions included Voss's

14

execution of a distribution agreement on behalf of Schratter that relinquished the discounts promised in the SPA pursuant to which the ECB Parties purchased Schratter. *Id.*, ¶¶ 195, 205, 214, 221. These are the continuing tort allegations.

### 3.    The Individual Defendants Directed Tortious Acts at Florida

The district court ignored the multitude of facts which establish that the Defendants directed their intentional torts at Florida.

In October 2014, the ECB Parties retained Freeman, an attorney based in Miami, Florida, to represent the buyers in connection with the purchase of Schratter. *Id.*, ¶ 78. From that point forward, the Individual Defendants focused their fraudulent activities at Florida. The wrongful acts include the following misrepresentations and tortious acts:

- communication with Freeman in Florida, advising Freeman that documents were available for review in the data room and Freeman ***accessed*** documents in the data room from Miami-Dade County, Florida, *id.*, ¶ 83;

- using the data room to disseminate documents in Florida, *id.*, ¶ 80;

- representing to Freeman, among others, in Florida, that all pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful, *id.*, ¶ 81;

- including in the data room documents that misrepresented the management structure of Schratter, identified Voss as Schratter's CEO/president, *id.,* ¶ 86;

15

- withholding documents that established that Wild, and not Voss, was the chief executive officer and holding virtually all day-to-day control over Schratter, *id.*, ¶ 85;

- transmitting the letter of intent to Freeman in Florida which misrepresented that Schratter was "owned by Seller but managed on a day-to-day basis by [Voss]… in his role as Company President/CEO," *id.*, ¶¶ 88, 90;

- sending misleading corporate governance documents to Freeman in Florida, *id.*, ¶ 92;

- misrepresenting, in writing and orally, to Freeman in Florida, *id.*, ¶¶ 110-11, that:

  (a) Voss was the president and chief executive officer of Schratter in form and substance and in charge of Schratter's day-to-day operations;

  (b) Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its CEO/president;

  (c) Schratter's books and records were accurate in all material respects and all documents material to the ECB Parties' purchase of Schratter were provided in the data room;

  (d) The transactions set forth in Schratter's books and records represented *bona fide* transactions and complied with all applicable laws and industry standards;

  (e) Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

  (f) Schratter was able to pay, and was current in the payment of, its debts and other obligations;

  (g) Schratter's operations were conducted in the ordinary course of business;

16

(h) Schratter complied with all laws in its operations;

(i) Voss through VEI was paid $10 million for its 25 percent interest in Schratter; and

(j) Schratter was in compliance with all of its financial obligations;

- sending to Freeman, in Florida, multiple drafts of the SPA which included many of the misrepresentations set forth in paragraph 110, *id.*, ¶¶ 110, 117;

- emailing and sending to Freeman in Florida the execution copies of the SPA, and execution copies of multiple other documents related to the transaction, *id.*, ¶ 117;

- scheduling closing of the SPA at Morgan Lewis & Bockius' office at 200 Biscayne Blvd., Suite 5300, Miami, Florida 33131, *id.*, ¶ 118;

- after the execution of the SPA, Gitlin, Wild, and Voss continued to provide false and misleading information and documents to the ECB Parties and Freeman in Florida, *id.*, ¶ 124, including sending Freeman in Florida, on February 23, 2015, the 2014 audited financial statements that contain numerous misrepresentations including that, *id.*, ¶¶ 133-34:

    (a) Schratter's financial statements correctly reflected Schratter's liabilities;

    (b) Schratter's financial statements were accurate, and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

    (c) Schratter's internal controls and procedures were sufficient to ensure that Schratter's financial statements were accurate in all material respects;

(d) the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(e) the financial statements revealed all related party transactions; and

(f) no material information relative to Schratter's financial position and operations was withheld from the financial statements;

- funding and closing the SPA through escrow, with Freeman holding documents in escrow in Miami, and disbursing the initial $2 million payment from his trust account in Miami, *id.*, ¶ 125; DE 53-1, at ¶¶ 9-10; and

- continuing to use Voss in Florida to cover-up the conspiracy and to further harm the ECB Parties by, among other things, inducing him to give away the valuable discount rights secured in the SPA in Florida, DE 31, ¶¶ 36, 39.

Under the SPA, the ECB Parties were required to pay $15 million to Zausner in June 2015. *Id.*, ¶¶ 115, 136. After closing on December 31, 2014, Voss was securely entrenched in various fiduciaries capacities in the ECB Parties' affairs. *Id.*, ¶ 190. The conspirators, including the Individual Defendants, were able to use Voss to ensure that no red flags would be raised because Voss was both Schratter's and Atlantic Ventures' CEO/president. *Id.*, ¶ 114. In a position to control information flow and diligence, Voss was able to manipulate the ECB Parties to conceal the frauds and secure payment of both the $2 million initial payment and the $15 million second installment. *Id.*, ¶¶ 125, 139. Voss, from the new headquarters in Florida,

was able to oversee the parties' review of the 2014 financial statements that were sent to the ECB Parties in Florida on February 23, 2015 and ensure that no red flags were raised regarding the conspiracy. *Id*., ¶ 114. Consequently, the Individual Defendants were able to close the transaction on December 31, 2014, *id*., ¶ 40, conceal their actions, *id*., ¶¶ 97, 152, and 153, and secure the payment of the $15 million installment in June 2015. *Id*., ¶¶ 115, 136.

Voss remained as president, director, and CEO of Schratter, and president and a director of Atlantic Ventures for almost three years. *Id*., ¶ 45. The ECB Parties and Schratter were located in Miami; Voss moved to Miami where he worked. *Id*., ¶¶ 143, 152. During this period, Voss continued to breach the fiduciary duties that they owed to the ECB Parties in Florida. *Id*.

Voss's actions were undertaken for the interest of the Savencia Companies as opposed to the interest of the ECB Parties, to which he owed fiduciary duties. *id.,* ¶¶ 15, 99, 120, 128, 191. Defendants and the Savencia Companies paid Voss at least $3 million in July 2014, and committed to pay Voss millions of additional dollars for his loyalty and to induce him to violate the fiduciary duties he owed the ECB Parties in furtherance of the conspiracy. *Id*., ¶¶ 140-43.

In addition, after closing and after Schratter's move to Florida in January 2015, the co-conspirators worked to take back the discounted pricing on Savencia products secured in the SPA. *Id.*, ¶¶ 39, 146-47. Savencia Cheese was the distributor

19

of those products. *Id.*, ¶¶ 39, 146. On June 30, 2015, Voss executed a new distribution agreement between Savencia Cheese and Schratter that changed the terms of the SPA without the consent of the ECB Parties. *Id.*, ¶¶ 36, 39. The new distribution agreement gave away the 10 percent discount and allowed Savencia Cheese to overcharge for products of Savencia Cheese and its affiliates. *Id.*, ¶¶ 37, 39, 146-47. The Individual Defendants used Voss to undermine and take away the discounts. *Id.*, ¶ 147. This breach of fiduciary duty occurred in Florida. *Id.*, ¶¶ 149, 150.

The conspiracy continued until Voss was terminated from Schratter and Atlantic Ventures in 2017. *Id.*, ¶ 157. With Voss no longer in a position to mislead, conceal, and "cook the books," the conspiracy could no longer be concealed. *Id.*, ¶¶ 152-54. Because of the fraud, the ECB Parties lost over $30 million. *Id.*, ¶¶ 41, 141-42.

## III. STANDARD OF REVIEW

The standard of review for a dismissal based on lack of personal jurisdiction and a dismissal for failure to state a claim is *de novo*, accepting the allegations in the complaint as true. *See Hogan v. City of Fort Walton Beach*, 817 Fed. Appx. 717, 721 (11th Cir. 2020).

## IV. SUMMARY OF THE ARGUMENT

The district court erred in dismissing the Individual Defendants for lack of

20

personal jurisdiction under the Florida long-arm statute Fla. Stat. § 48.193(1)(a)(2) because the Individual Defendants, along with Savencia Cheese, committed, and/or conspired to commit, intentional torts aimed at the ECB Parties (both Florida corporations) in Florida and who suffered harm in Florida by: (a) the electronic transmission of fraudulent information and misrepresentations into Florida; (b) the creation of a data room containing documents with misrepresentations designed to be accessed from Florida and which were accessed from Florida; and (c) the commission of intentional torts outside of Florida that caused injury to the ECB Parties in Florida.

The exercise of jurisdiction satisfies due process considerations under the U.S. Constitution because the Individual Defendants committed intentional torts directed at Florida and which caused harm to Florida residents in Florida.

Each of the Individual Defendants is also subject to personal jurisdiction under the conspiracy theory of jurisdiction because the acts of co-conspirators in Florida may be attributed to a foreign defendant for the purpose of establishing personal jurisdiction even if the foreign defendant never committed an act in the state of Florida.

The district court erred, both factually and legally, in dismissing the three conspiracy claims under the intracorporate conspiracy doctrine because during the course of the conspiracy (a) from January 1, 2015 until April 2017 one of the co-

conspirators, Voss, was not an agent or employee of any of the various corporate members of the conspiracy; and (b) prior to January 1, 2015, co-conspirator Voss had a "personal stake" in committing the wrongful acts: to wit, he was seeking (i) to obtain a 45 percent interest in the shares of Schratter; and (ii) to be appointed as president and a director of Atlantic Ventures, and employed as the CEO/president of Schratter.

The district court also erred in dismissing the substantive conspiracy claims against Savencia Cheese for failure to state a claim because the ECB Parties alleged all elements of conspiracy with sufficient particularity to satisfy the pleading requirements of both Rule 8 and 9 of the Federal Rules of Civil Procedure, including Savencia Cheese's involvement in the conspiracy and the Savencia Cheese's commission of an overt act in furtherance of the conspiracy.

The district court also erred in dismissing the claim for aiding and abetting a breach of fiduciary duty against Savencia Cheese for failure to state a claim because the ECB Parties alleged all elements of the claim, including that Savencia Cheese had knowledge of the existence of a fiduciary duty, a wrongful act on the part of Voss, and the rendering of substantial assistance in committing the wrongdoing.

The district court also erred in dismissing the claim for tortious interference with contract against Savencia Cheese for failure to state a claim because the ECB Parties alleged all elements of the claim, including that Savencia Cheese had

knowledge of the existence of the contract at issue and procured an intentional and unjustified breach by causing Voss to enter into a distribution agreement that gave away the ECB Parties' discounted pricing and distribution rights without the knowledge of the ECB Parties, who owned those rights.

## V.    ARGUMENT

### A.    The District Court Erred in Holding that the Individual Defendants Were Not Subject to Personal Jurisdiction Under the Florida Long-Arm Statute for Having Committed, and/or Conspired to Commit, Torts in Florida

#### 1.    The Florida Long-Arm Statute Provides for Specific Jurisdiction Over the Individual Defendants, who Committed Tortious Acts in Florida

This Court applies a two-prong test to determine if a nonresident is subject to *specific* personal jurisdiction under the Florida long-arm statute. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). **First**, the Florida long-arm statute must provide a basis for personal jurisdiction – in this case the commission of tortious acts in Florida. *See* Fla. Stat. § 48.193(1)(a)(2). **Second**, the exercise of personal jurisdiction must satisfy traditional notions of fair play and substantial justice under the Due Process Clause – in this case, the commission of an intentional tort directed at Florida. Each prong will be discussed in turn.

The Florida long-arm statute provides:

(1)(a) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this

subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

...

(2) Committing a tortious acts within this state.

Fla. Stat. § 48.193(1)(a)(2).

As this Court has stated, the analysis of specific jurisdiction begins and ends with Section 48.193(1)(a)(2). *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022), *cert. denied sub nom. Expedia Group, Inc., et al. v. Del Valle, Mario, et al.,* 22-1169, 2023 WL 6377917 (U.S. Oct. 2, 2023) 56 F.4th at 1273–74. Thus, the sole question under the first prong is whether the Individual Defendants committed a tortious act in Florida as that term is construed by the Florida Supreme Court. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013).

The Florida Supreme Court construes the term "tortious act" broadly to include telephonic, email, and other electronic communications from outside of Florida to inside of Florida. *See Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). In *Wendt*, the Florida Supreme Court made explicit that:

First, in order to "commit a tortious act" in Florida, a defendant's physical presence is not required. Second, "committing a tortious act" in Florida under section 48.193(1)[(a)(2)][1] can occur through the

---

[1] Section 48.193 was amended in 2013 such that Section 48.193(1)(b), referenced in *Wendt*, now corresponds to Section 48.193(1)(a)(2) in the current version of the

24

nonresident defendant's telephonic, electronic, or written communications into Florida. However, the cause of action must arise from the communications.

*Id.* In *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201 (Fla. 2010), the Florida Supreme Court explained that electronic communications include conveyance of information into Florida through a website, "provided that the website posts containing the statements ***are accessible in Florida and accessed in Florida***." *Id.* at 1215 (emphasis added). Once the offending material is accessed in Florida, the material has been published in Florida and the person who posted the material has communicated the material into Florida, thereby committing a tortious act in Florida. *See id*; *see also Del Valle*, 56 F.4th at 1273–74 (holding that an out-of-state transmission of information on company of website used in violation of law and accessed in Florida caused website's owner to be subject to the Florida Long-Arm Statute). The Florida Supreme Court held that internet method of transmission is a "straightforward" instance of a nonresident defendant's communications into Florida. *See Internet Sols.,* 39 So. 3d at 1208. This principle of jurisdiction also applies to email communications if those emails "[we]re directed to reach a specific recipient in a specific forum." *Id.*

Moreover, even if a transmission of false information did not reach Florida,

statute.

25

the Eleventh Circuit has consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida "by performing an act outside the state that causes injury within Florida." *Del Valle*, 56 F.4th at 1273–74 (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir. 1999); *Licciardello v. Lovelady*, 544 F.3d 1280, 1283-84 (11th Cir. 2008); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013)).

Furthermore, in the context of a conspiracy, this Court recognizes that the Florida long-arm statute "support[s] personal jurisdiction over an alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." *United Technologies. Corp. v. Mazer*, 556 F.3d 1260, 1281-82 (11th Cir. 2009); *see also Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd*., 752 So. 2d 582, 586 (Fla. 2000) (Florida Supreme Court holding that in a conspiracy, "[a]ctual physical presence in Florida is not required . . . [because] the acts of co-conspirators may be attributed to a foreign defendant for the purpose of establishing personal jurisdiction even if the foreign defendant never committed an act in the state of Florida").

Additionally, conspiracy-based jurisdiction will lie where, as here, a defendant "fail[s] to dispute the underlying [specific] factual allegations that the Defendants engaged in a conspiracy, and the Court has jurisdiction over the alleged

26

principal act." *Landmark Bank, N.A. v. Cmty. Choice Fin., Inc.*, No. 17-60974, 2017 WL 4310754, at *12 (S.D. Fla. Sept. 28, 2017) (internal citations omitted).

Finally, communication directed to an attorney in Florida is the same as communication directed to a principal in Florida because the attorney is an agent of his or her client. The Fourth District Court of Appeal, in *Cruise v. Graham*, held:

> Appellants argue first that their motion for summary judgment should have been granted because appellee alleged in his complaint that he had communications with appellants, where, in fact, any such communications were between appellants and appellee's attorney. This argument is without merit. ***An attorney acts as the client's representative, and representations made to the attorney are representations made to that attorney's client***. *Cf. Andrew H. Boros, P.A. v. Arnold P. Carter, M.D., P. A.*, 537 So. 2d 1134, 1135 (Fla. 3d DCA 1989) ("Generally, ***an attorney serves as agent for his client***; the ***attorney's acts are the acts of the principal, the client***."); *Kates v. Millheiser*, 569 So. 2d 1357 (Fla. 3d DCA 1990) (same); see also *Joseph v. Norman LaPorte Realty, Inc.*, 508 So. 2d 496, 497 (Fla. 3d DCA 1987) (legally irrelevant that fraudulent misrepresentations were made to the plaintiffs' agent rather than to them directly).

622 So. 2d 37, 39 (Fla. 4th DCA 1993) (emphasis added). Applying the above law to the unrebutted specific factual allegations set forth above, the Individual Defendants committed tortious acts in Florida in at least five ways.

**First**, as established in the Statement of Facts above, the Amended Complaint alleges that the Individual Defendants made misrepresentations in their telephonic, electronic, or written communications into Florida. A few highlighted ones are repeated below:

27

- Gitlin, Ragnet, Wild, Bongrain and Voss misrepresented to the ECB Parties that all pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful, which representations are set forth in the drafts of the SPA sent to Freeman in Florida and in the executed SPA, as well as in other documents. DE 31, ¶ 81;

- Gitlin prepared, *id.*, ¶ 89, and transmitted the letter of intent between VEI and ZNHC/Zausner for the purchase of Schratter to Freeman in Florida, *id.,* ¶¶, 74, 88. The letter of intent misrepresented that "Schratter was "owned by Seller but **managed on a day-to-day basis by [Voss]**… **in his role as Company President/CEO."** (Emphasis added). *Id.,* ¶ 90;

- in addition to the written misrepresentations in the drafts of the SPA, each of the Individual Defendants made the oral misrepresentations that are set forth in paragraph 110 of the Amended Complaint to Freeman in Florida. *Id*., ¶¶ 110-11;

- on February 23, 2015, Gitlin transmitted the audited 2014 financial statements to Freeman in Florida. *Id.,* ¶ 133. The 2014 audited financial statements contained numerous misrepresentations. *Id.,* ¶ 134. Gitlin and the other Individual Defendants intended for the ECB Parties to rely on the 2014 financial statements in making the $15 million payment in June 2015. *Id.,* ¶¶ 115, 136. The ECB Parties made the $15 million second payment in June 2015 in reliance on the misrepresentations. *Id.,* ¶¶ 139, 141.

- during the years 2016 through 2018, Savencia Cheese directed communications in furtherance of the Distribution Fraud to the ECB Parties in Florida, including, but not limited to, sending invoices for payment for foreign affiliate cheeses and domestic cheeses to Florida. *Id.,* ¶ 149.

**Second**, the Individual Defendants committed tortious acts through the creation of a data room (*i.e.*, an online portal) and the inclusion of fraudulent documents therein that they intended to be accessed in Florida, and which were, in fact, accessed in Florida. *See Id*., ¶¶ 75-76, 83. The fraudulent documents included two management charts discussed above that misrepresent Voss's roles and

authority. *Id*., ¶ 86. It is alleged and unrebutted that the Individual Defendants intended for the ECB Parties to rely on the documents uploaded into the data room, and that the Individual Defendants relied on the documents from the data room, all as set forth in the Statement of Facts, *supra*.

The inclusion of documents in the data room for access from Florida is directly analogous to the Florida Supreme Court's holding, in *Internet Sols.*, that access to tortious information on a website from Florida gives rise to personal jurisdiction in Florida. *See Internet Sols.,* 39 So. 3d at 1215. Once the Individual Defendants included documents in a data room that were intended to be accessed in Florida, and were accessed in Florida, they committed a tort in Florida, thereby becoming subject to personal jurisdiction in Florida. *See id.; see also Del Valle*, 56 F. 4th at 1273-4.

In fact, the intentional creation of an online virtual data room intended to be accessed from Florida, and accessed from Florida, is an even stronger case for personal jurisdiction than found in *Internet Sols.* This is because, unlike *Internet Sols.*, which dealt with a generic online publication randomly accessed from Florida, in the instant case the Individual Defendants created a virtual data room specifically so that it would be accessed online by the ECB Parties, Florida corporations, and their Florida counsel, Freeman, in Florida. DE 31, ¶ 75. As established above, transmitting information to buyers' deal counsel Freeman is the same as if it had

29

been transmitted to the ECB Parties. *See Cruise*, 622 So. 2d at 39.

**Third**, the Individual Defendants are also subject to jurisdiction in Florida because they committed tortious acts outside of Florida that caused injury in Florida. *See supra, Del Valle*, 56 F.4th at 1272; s*ee also Estate of Scutieri v. Chambers*, 386 Fed. App'x 951, 955 (11th Cir. 2010) ("Unless and until the Florida Supreme Court rejects our construction of the long-arm statute, we are bound to follow our '**firmly established precedent**, which interprets subsection (1)[(a)(2)] to apply to **defendants committing tortious acts outside the state that cause injury in Florida**.'") (emphasis added).

To the extent that the tortious acts articulated in the Amended Complaint occurred outside of Florida, they were intended to cause injury to the ECB Parties in Florida and, in fact, caused injury in Florida, to the ECB Parties, both Florida corporations with their principal place of business in Florida. *See* Statement of Facts, *supra.* For example, the $2 million initial payment was made to Zausner from Freeman's escrow account in Florida. DE 31*,* ¶ 125, DE 53-1, ¶¶ 9-10. Likewise, the ECB Parties were harmed when they paid the $15 million June 2015 installment. DE 31, ¶ 139. In addition, the ECB Parties suffered their injuries from the relinquishment of pricing discounts from Florida, as Voss was living and operating in Florida after Schratter's headquarters moved in January 2015. *Id.*, ¶¶ 32, 62, 150. Defendants cannot dispute an intent to close the transaction in Miami when the parties explicitly

agreed to do so. *Id.*, ¶ 118. This is important because a wrongdoer is subject to specific jurisdiction where it intended to cause injury. *See Trans Am Worldwide, LLC v. JP Superior Sols., LLC*, No. 4:17cv560–MW/CAS, 2018 WL 3090394, at *4 (N.D. Fla. Apr. 30, 2018). Inasmuch as the closing on the SPA was scheduled to take place in Florida, DE 31, ¶ 118, the Individual Defendants cannot credibly argue that they did not reasonably anticipate that the conspiracy would cause injury to the ECB Parties in Florida.

**Fourth**, each of the Individual Defendants are subject to personal jurisdiction in Florida because other co-conspirators committed tortious acts in Florida, *e.g.,* Voss, Gitlin Ragnet, and Wild, all communicating false information into Florida received by Freeman. *Id.*, ¶¶ 83, 88, 92. The formation and existence of the conspiracy remains unchallenged by the Individual Defendants, as they filed no counter evidence as to any specific allegations. Moreover, none of the Individual Defendants contradicted the allegations in the Amended Complaint regarding the overt acts committed in furtherance of the agreement to join in the conspiracy.

Each of the Individual Defendants is subject to long-arm jurisdiction in Florida because each was a co-conspirator in the commission of frauds and breaches of fiduciary duties directed against, and causing injury to, the ECB Parties in Florida. *See Execu-Tech*, 752 So. 2d 582 at 586; *see also United Technologies Corp. v Mazer*, 556 F.3d 1260 at 1281–82; *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994)

31

(holding that if plaintiff successfully alleges conspiracy and "any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to jurisdiction" in Florida).

By way of example, under *Executech* and *United Technologies*, the uncontradicted allegations of Gitlin's multiple tortious acts, many of which were directed to Florida, and all of which are attributable to all conspirators, are sufficient to establish personal jurisdiction over all the Individual Defendants in Florida. *See* DE 31, ¶ 39 (agreed to participate in conspiracy); *id*., ¶ 44 (prepared and signed secret employment letters); *id*., ¶ 50 (signed confidentiality agreement); *id*., ¶ 54 (seized control of management with other senior executives); *id*., ¶58 (signed, drafted, approved, concealed June 2014 Agreements); *id*., ¶¶ 65, 66 (misrepresented Voss' employment with Schratter); *id*., ¶ 75 (prepared letter of intent); *id*., ¶ 76 (included documents with misrepresentations in data room); *id*., ¶ 81 (misrepresented that the information in the data room was complete, accurate, and truthful); *id*., ¶ 83 (told Freeman that the documents were available for review in Florida); *id*., ¶ 87 (executed letter of intent with misrepresentations); *id*., ¶ 98 (negotiated the SPA); *id*., ¶ 104 (misrepresented that VEI was paid $10 million for its shares in Schratter); *id*., ¶ 107 (misrepresented that the financial statements were accurate and complied with GAAP, GAAS, and IFRS standards); *id*., ¶ 108 (caused drafts of the SPA to be sent to Florida); *id*., ¶ 110 (made multiple misrepresentations

to Freeman in Florida); *id.*, ¶ 124 (repeated misrepresentations after execution of SPA); *id.*, ¶ 132 (sent audited financial statements with multiple misrepresentations to Freeman in Florida in February 2015).

In the Order on jurisdiction, the district court invokes the intracorporate conspiracy doctrine to support its determination that a conspiracy claim must be dismissed. DE 124 at 6. Specifically, the district court rationalized that "until the date of the closing, the Individual Defendants and the alleged non-party conspirators were employed by related companies." However, the district court's reasoning is faulty because: (a) it does not account for Voss's role in the conspiracy; and (b) it ignores the personal stake exception to the intracorporate conspiracy doctrine.

As to (a), Voss's role, from January 1, 2015, until his termination as president of and a director of Atlantic Ventures and Schratter in 2017, Voss was not an employee or agent of any of the Savencia Companies because Schratter was sold on December 31, 2014. DE 31, ¶¶ 125-26. From that point forward, Voss was only a co-conspirator who was employed by Schratter and an officer and director of Atlantic Ventures. DE 53-1, ¶¶ 13-14. Voss is not alleged to be employed or affiliated with any of the Savencia Companies during this time, which means there is the multiplicity required for a conspiracy. DE 124 at 6. During this time period, while pretending to act in the interest of the ECB Parties, Voss was actually working in Florida on behalf of the conspiracy. DE 31, ¶ 143. On February 23, 2015, after

closing, the conspirators sent the fraudulent 2014 Financial Statements to Florida as part of the effort to secure payment of the $15 million second installment. *Id.*, ¶ 139. Voss was shepherding the post-closing diligence process prior to the $15 million payment to make sure that the ECB Parties, who relied on him as a fiduciary, found no red flags that would prevent the $15 million second installment. *Id.*, ¶ 114. Moreover, during this period, working with Voss, the conspirators executed with Voss the distribution agreement that surrendered significant discounts. *See* Statement of Facts, *supra*. This alone establishes that ***not*** all conspirators were employees of the Savencia Companies.

As to (b), the "personal stake" exception, during the period from August 1, 2014, until December 31, 2014, Voss had an interest that was separate and distinct from that of the Savencia Companies. Voss was a  member of the buyer group, signed the letter of intent on the buyer side, not the seller side,, DE 31, ¶89, was receiving 45 percent of Schratter for himself, *id.*, ¶ 116, and secured appointment as the CEO/president of Schratter and president and director of Atlantic Ventures, *id.*, ¶ 190. *See also* Statement of Facts, *supra.*

The above facts referenced in the Statement of Facts above are all pled in the Amended Complaint in much greater detail than is required to satisfy notice pleading. In fact, particularized pleading is not necessary. While Defendants can deny the personal stake, "at the motion to dismiss stage, the plaintiff's allegations of

34

fact are taken as true." *Israel v. Bellsouth Telecommunications, Inc.*, 12-60806-CIV, 2012 WL 12862809, at \*5 (S.D. Fla. July 10, 2012) (somewhat "threadbare" allegations were sufficient to "evade the intracorporate conspiracy documented at the motion to dismiss stage"). In the instant case, the Individual Defendants made no attempt to rebut the factual allegations underlying the personal stake exception. They rested their entire case on denial of general jurisdiction.

It is understandable that the Individual Defendants did not take the common strategy of arguing that Voss's actions were in service to the Savencia Companies. This is because such an argument would put them in the position of arguing that Voss seeking an equity interest in Schratter, and his appointment as president and director of Atlantic Ventures pre-closing, and CEO/president of Schratter post-closing, were taken in his capacity as an employee in the Savencia Companies. Thus, the Savencia Companies would be admitting liability.

In any event, it would be "premature to dismiss a conspiracy claim at the pleadings stage based on the intracorporate conspiracy doctrine where the complaint pleaded facts supporting a plausible inference that the individual defendants potentially had a personal stake in the alleged misconduct." *Julisa, LLC v. Avers*, 20-23203-CIV, 2020 WL 13267753, at \*6 (S.D. Fla. Nov. 4, 2020)(quoting *N.R. by Ragan v. Sch. Bd. of Okaloosa Cty., Fla.*, 418 F. Supp. 3d 957, 1001–02 (N.D. Fla. 2019).

**Fifth**, personal jurisdiction over the Individual Defendants is also proper because the entire purchase transaction and the post-closing torts occurred in Florida. The district court attempts to minimize the nexus of the transaction to Florida stating that "closing in Florida was clearly not an essential element of the deal." DE 124 at 5. This statement is factually wrong and ignores that the closing in Florida was part of the deal. As the district court acknowledged, the parties scheduled the closing in Miami. *Id.* While the transaction did not physically close at Morgan Lewis's offices in Miami, it closed in escrow from the offices of Freeman in Miami, Florida. DE 53-1, ¶¶ 7-10. The district court's statement that the closing took place virtually, DE 124 at 5, does not change the fact that the closing was done in escrow from Freeman's office in Miami, with Freeman holding and distributing the documents and money from his office and trust account in Miami. DE 31, ¶ 125; DE 53-1, ¶¶ 9-10.

Based upon the foregoing, the uncontradicted allegations in the Amended Complaint establish that the entire nexus of the transaction was in Florida. The conduct alleged in the Amended Complaint falls squarely within both *Wendt* and *Internet Sols.*, binding Florida precedent, and thus, the exercise of long-arm jurisdiction in Florida is proper.

### 2. The Commission of an Intentional Tort in Florida as a Basis for Personal Jurisdiction Satisfies the Due Process Clause

In *Del Valle*, this Court recently explained that:

[i]n specific jurisdiction cases like this one, we examine whether (1) the plaintiff's claims "arise out of or relate to" one of the defendant's contacts with the forum state; (2) the nonresident defendant "purposefully availed" itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in accordance with traditional notions of "fair play and substantial justice."

*Del Valle*, 56 F.4th at 1275 (internal citations omitted). Each of the three prongs will be discussed separately.

The first prong of relatedness requires that the tortious acts in Florida "arise at least in part directly out of the contacts…with Florida." *Id*. This prong does not require that "defendants' forum conduct directly give rise to the plaintiff's claims." *Id*. The first prong is readily met in the instant case. There is no issue as to whether the claims arise out of the contacts with Florida. The Individual Defendants communicated multiple misrepresentation into the state of Florida in an effort to persuade Florida corporations, based in Florida, to purchase Schratter, in Florida. DE 31, ¶¶ 75-76. The Individual Defendants created an online data room and uploaded documents into that data room with the intent that they be accessed from Florida. *Id.*, ¶¶ 79-81. The data room and the fraudulent documents were accessed from Florida. *Id.*, ¶ 83. The parties intended that the closing take place in Florida and the closing took place in escrow from the offices of Freeman, in Florida. *Id.*, ¶ 125; DE 53-1, ¶¶ 9-10. The injuries occurred in Florida. DE 31, ¶ 2. While there

37

were many misrepresentations made elsewhere, the entire transaction revolved around a purchase in Florida. *Id.*, ¶ 125.

Moreover, after the December 31, 2014, closing, the tortious acts continued in Florida by virtue of the fact that Voss was moved to Florida, worked in Florida, covered up the scheme from Florida, and acted against the interest of the ECB Parties (to whom he owed a fiduciary duty) from Florida, including entering into a distribution agreement that improperly gave away valuable discounts. *Id.*, ¶¶ 217, 220, 221. The torts not only relate to Florida, but the entire transaction and relationship is centered in Florida. *Id.*, ¶ 125. All of these facts are further substantiated in the Statements of Facts, *supra*. Accordingly, the first prong is readily met.

The second prong concerns purposeful availment, which can be satisfied by the effects test or the minimum contacts test or both. *See Del Valle*, 56 F.4th at 1276 ("[B]oth the effects test and the minimum contacts test are satisfied. As a result, we do not have to choose one test over the other with respect to purposeful availment.").

In the instant case, purposeful availment is clearly established by the effects test which can be satisfied by the commission of an intentional tort in Florida, which caused harm that the Individual Defendants could have reasonably anticipated would be suffered in Florida. This Court explained the effects test in *Del Valle* as follows:

Under the effects test, a nonresident defendant's single tortious acts

38

> can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state. *See Lovelady*, 544 F.3d at 1285. The test is met when the tort was intentional, aimed at the forum state, and caused harm that the defendant should have anticipated would be suffered in the forum state. *See id.* at 1285–86, 1287–88. In *Lovelady*, for example, we held that the defendant's use of the Florida plaintiff's trademarked name and picture on a website accessible in Florida satisfied the effects test for personal jurisdiction because it entailed "the commission of an intentional tort aimed at a specific individual in the forum whose effects were suffered in the forum." *Id.* at 1288.

*Id*. at 1275–76 (11th Cir. 2022). In the instant case, for the same reasons discussed above as to "relatedness," the relevant claims are based in part on the tortious acts committed by the Individual Defendants and their co-conspirators in Florida.

That leaves the third prong, "fair play and substantial justice", which considers: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the judicial system's interest in resolving the dispute." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Once a plaintiff has satisfied the first two prongs, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Louis Vuitton*, 736 F.3d at 1355. Far from making a "compelling case," in their briefing before the district court, the Individual Defendants only gave cursory attention to this issue: a single conclusory, factually-incorrect statement that the Individual Defendants' only "alleged connection to this action, at most, are their

39

corporate roles within non-parties or 'affiliates' of Savencia, S.A."). DE 41 at 21.

This is completely contradicted by the numerous uncontroverted allegations in the Amended Complaint set forth above in the Statement of Facts, identifying numerous tortious acts by the Individual Defendants, all directed to residents of Florida and causing injury in Florida, before and after the closing of the sale of Schratter. *See* Statement of Facts, *supra.* The Individual Defendants did not argue they would face a substantial burden by litigating in Florida, much less offer any evidence to that effect. Likewise, they did not argue that Florida has no interest in adjudicating a dispute in which Florida corporations were defrauded, by misrepresentations communicated into Florida, in a transaction based in Florida, that closed in Florida as intended, on signed documents and funds released from Florida. Finally, the Individual Defendants do not mention the interest of the ECB Parties, who are Florida corporations based in Florida, in litigating this case in their jurisdiction and where their principal place is located. The Individual Defendants do not make these arguments because Florida has "significant interests at stake," including "'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors[.]'" *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1030 (2021) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). In conclusion, the Individual Defendants made no effort to meet their burden under the "fair play and substantial justice" prong, and, therefore,

the district court's ruling in their favor must be reversed.

One of the reasons why the district court was incorrect was because it found that "[t]he only allegations of 'activity' in Florida by the Individual Defendants were that in October 2014 the ECB Parties hired a lawyer in Miami who was granted permission to access a data room during the ECB Parties' due diligence and who participated in the negotiations. (DE [31] ¶¶ 78, 83, 92, 111, 117 and DE [51] Ex. 1)." DE 124 at 5. As set forth above, the facts establish that the district court disregarded the plethora of specific factual allegations of tortious acts directed toward Florida. Furthermore, from a legal perspective, the hiring of Freeman as the attorney is not the point. The point is that the Individual Defendants and their co-conspirators directed their fraudulent communications to Freeman in Florida. *See* Statement of Facts, *supra.* Directing those communications to Freeman in Florida was the same as directing them to the ECB Parties themselves in Florida. *See Cruise*, 622 So. 2d at 39. Again, Freeman handled the purchase of Schratter from Florida on behalf of the ECB Parties, two Florida corporations. DE 31, ¶¶ 78, 81. Moreover, the Amended Complaint is replete with specific instances in which the Individual Defendants and their co-conspirators made misrepresentations to Freeman in Florida. *See, e.g.*, *id.*, ¶¶ 81, 83, 88, 92, 111, 117, 124, 133. The district court erred in disregarding these specific and numerous allegations, which were unrebutted by the Individual Defendants.

41

**B.    THE DISTRICT COURT ERRED IN DISMISSING THE SUBSTANTIVE CLAIMS AGAINST SAVENCIA CHEESE FOR FAILURE TO STATE A CLAIM**

### 1.  The ECB Parties Alleged a Claim for Conspiracy

The district court correctly identified the elements of conspiracy as (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. *See Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). DE 127 at 5. The basis of a civil conspiracy action cannot be the conspiracy itself but the civil wrong which is done through the conspiracy resulting in injury to the plaintiff. *See e.g., Buckner v. Lower Florida Keys Hospital District*, 403 So. 2d 463 (Fla. 3d DCA 1982). In the instant case, the underlying wrongs alleged include breach of fiduciary duty, constructive fraud, and fraud. DE 31, ¶¶ 209, 211, 213.

"The pleading standard for a civil conspiracy claim is the low 'notice' standard set forth in Federal Rule of Civil Procedure 8(a) and, hence, the claim need not be plead with particularity. Of course, if the civil wrong alleged is fraud, then the facts constituting fraud must meet the requirements of Federal Rule of Civil Procedure 9(b)." *Okeda de Mexico, S.A. de C.V. v. Heras*, 04-23168-CIV, 2005 WL 8155961, at *3 (S.D. Fla. May 5, 2005). Even if Rule 9 were applied to the fraud claims, "a great quantum of detail need not be required to be alleged as to the

formation of the conspiracy because of the clandestine nature of the scheme or undertaking engaged in. The existence of the conspiracy must often be inferentially and circumstantially derived from the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action." *Peters v. Amoco Oil Co.*, 57 F. Supp. 2d 1268 (M.D. Ala. 1999).

As to the breach of fiduciary duty claim and the constructive fraud claim, particularity is not required. *See, e.g., Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012) (reversing dismissal of claim for breach of fiduciary duties based on application of Rule 8); *Altimas v. Whitney*, 209CV682FTM36SPC, 2010 WL 11507317, at *2 (M.D. Fla. Dec. 9, 2010) ("Although this [breach of fiduciary duty] cause of action sounds in fraud, the Rule 8 pleading standard nonetheless applies.").

The district court dismissed the conspiracy claims based upon an incorrect finding that "the [Amended] Complaint alleges no facts that would support a finding that Savencia Cheese was involved in the alleged conspiracy or took an overt act in furtherance of the conspiracy. There are no facts alleged that would establish Savencia Cheese agreed to participate in an unlawful or fraudulent act. There are no facts that would establish that Voss was acting as an 'inside man' for Savencia Cheese." DE 127 at 6.

The district court's finding ignores the detailed allegations of the Amended Complaint which satisfy both the requirements of Rule 8 and the heightened

requirements of Rule 9(b). The ECB Parties allege an agreement to commit wrongs that sets forth the specific role undertaken by Savencia Cheese:

> 39.    The Bongrain Conspiracy also required the participation of Savencia Cheese to undermine valuable rights to discounts provided to Plaintiffs in the Stock Purchase Agreement. As is set forth in detail, *infra,* each of the Bongrain Defendants and Savencia Cheese acted in furtherance of the Bongrain Conspiracy.

> 40. In the months before June 30, 2014, the individual Bongrain Defendants and their co-conspirators agreed to implement the Bongrain Conspiracy. They agreed amongst themselves that they would take the steps necessary to strip Schratter of its assets, to strip Voss of his corporate offices and authority, to make the necessary misrepresentations to sell Schratter at a grossly inflated price, ***and, along with Savencia Cheese***, to take such further action to harm Schratter, and any ultimate purchaser of Schratter, for the benefit of Savencia and its affiliates. The Bongrain Defendants and Savencia Cheese worked in concert to commit the torts described in this action, and the actions taken by each individual defendant were on behalf of each such defendant and the other co-conspirators.

DE 31, ¶¶ 39, 40. The Amended Complaint further sets forth the specific purpose of the portions of the conspiracy involving Savencia Cheese as follows:

> 36.    The third fraud consisted of the revocation of discounts and rights to purchase foreign cheese products that were negotiated as consideration for Plaintiffs' purchase of Schratter. The Bongrain Defendants and Savencia Cheese, working with their co-conspirator Voss, caused Schratter to revoke and give away substantial pricing discounts and rights through the execution of a distribution agreement between Savencia Cheese and Schratter on June 30, 2015 (the "Distribution Agreement"). The Distribution Agreement purported to change the terms of the Stock Purchase Agreement dated December 6, 2014 (the "Stock Purchase Agreement") without the written consent of Plaintiffs, who were parties to the Stock Purchase Agreement (the "Distribution Agreement Fraud").

44

222. Similarly, the Bongrain Defendants and Savencia Cheese conspired with Voss to breach Voss's fiduciary duties to Plaintiffs with respect to the Distribution Fraud as more fully described in paragraphs 36, 37 and 144 through 151 above.

*Id.*, ¶¶ 36, 222.

The Amended Complaint clearly alleges an overt act: the execution of the distribution agreement that gave away the special pricing discounts promised under the SPA:

Savencia Cheese and the Bongrain Defendants, along with Voss, wrongfully caused Schratter to give up substantial pricing discounts and distribution rights through the execution of a fraudulent distribution agreement between Savencia Cheese and Schratter.

*Id.*, ¶¶ 36, 220.

Savencia Cheese procured an intentional and unjustified breach of the discounted pricing and rights to distribute the Savencia products for a period of ten years by the execution of the Distribution Agreement which changed the terms upon which Schratter would purchase Savencia products.

*Id.*, ¶ 220. The execution of the distribution agreement by Savencia Cheese is an overt act.

In its 12(b)(6) order, the district court incorrectly states: "the Distribution Agreement *was* the alleged conspiracy. This is not an actionable conspiracy claim. 'An overt act is an act done in pursuance of the conspiracy.' Therefore, the act must be in furtherance of the conspiracy and not merely be the conspiracy itself." DE 127

at 6 (citations omitted). This finding by the district court misstates both the facts and the law. As alleged in the Amended Complaint, one aspect of the conspiracy was the effort to cause "the revocation of discounts and rights to purchase foreign cheese products that were negotiated as consideration for Plaintiffs' purchase of Schratter." DE 31, ¶ 36. Those rights were included in the SPA. *Id.* The overt act by Savencia Cheese was the execution of the distribution agreement. The effect of this overt act was to divest the ECB Parties of the discount benefits they had negotiated in the SPA, in furtherance of the conspiracy. *See e.g., Id.*, ¶¶ 36, 39, 144-51, 187, 194, 220.

In addition to the failure to identify the overt act of executing the distribution agreement, the district court's holding was also based on a reductive view of the scope of the conspiracy being limited only to the discounts. However, the Amended Complaint also clearly alleged that Voss was acting as an "inside man" in Schratter when he executed the distribution agreement without the knowledge or consent of the ECB Parties. *Id.*, ¶ 213. The Amended Complaint explains in detail how the co-conspirators induced Voss to join the conspiracy, paid him millions and promised him millions more, and used him to continue the tortious acts, cover them up, and sign the distribution agreement relinquishing the discounts in the SPA. *Id.*, ¶¶ 27-32, 64-97, 129-30, 143, 144-51. The Amended Complaint further alleges that the conspiracy continued until Voss was terminated as president of Atlantic Ventures and Schratter in April 2017. *Id.*, ¶ 62.

46

For the foregoing reasons, this Court should reverse the district court's dismissal of the conspiracy claims and remand this action for further proceedings.

### 2.  The ECB Parties Alleged a Claim for Aiding and Abetting a Breach of Fiduciary Duty

The district court correctly identified the elements of a cause of action for aiding and abetting in Florida: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed Appx. 988, 993 (11th Cir. 2014). The ECB Parties alleged all four elements.

**First**, the Amended Complaint alleges that Voss was a fiduciary of the ECB Parties and that he committed a wrong by giving away the substantial pricing discounts and rights secured by the ECB Parties in the SPA. DE 31, ¶ 218. As president of Atlantic Ventures, Voss owed a fiduciary duty to both Atlantic Ventures and its shareholder ECB USA. *Id.*, ¶ 29. As CEO/president of Schratter, Voss owed a fiduciary duty to its sole shareholder Atlantic Ventures. *Id.*, ¶ 160. Voss also owed a fiduciary duty to the ECB Parties because he invited them into a relationship of trust and confidence, which they accepted. *Id.* The Amended Complaint also alleges that Voss and Savencia Cheese caused Schratter to revoke and give away substantial pricing discounts and rights through the execution of a distribution agreement

47

between Savencia Cheese and Schratter on June 30, 2015, "without Plaintiffs' knowledge and consent." *Id.*, ¶ 213. The distribution agreement changed the terms of the SPA without the written consent of Plaintiffs, who were parties to the SPA. *Id.*, ¶¶ 36, 220. This allowed Savencia Cheese to overcharge for the foreign cheeses it sold to Schratter, and to cease distributing other foreign cheeses to Schratter, damaging the ECB Parties. *Id.*, ¶ 37.

**Second**, the district court incorrectly held that the Amended Complaint "contains no allegations that Savencia Cheese had knowledge of the existence of a fiduciary duty or a wrongful act on the part of Voss." DE 127 at 7. However, the Amended Complaint specifically alleges that Savencia Cheese, as a party to the conspiracy, intended that the ECB Parties take Voss as their fiduciary, including even having Voss sign the letter of intent on the buyer side. DE 31, ¶¶ 90,128, 182. Moreover, the claim is supported by the allegations that Savencia Cheese was a Delaware limited liability company, and an affiliate of Zausner and Savencia in North America. *Id.*, ¶ 13. Savencia Cheese shared a group legal counsel for North American Affiliates (Gitlin), *id.*, ¶ 10 and a group CFO for North American Affiliates (Wild), *id.*, ¶ 8. Since Gitlin and Wild represent all North American affiliates of the Savencia Companies, and Savencia Cheese is an affiliate incorporated in Delaware, Savencia Cheese is imputed with the knowledge of Gitlin and Wild. *See Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young,*

*L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors … is imputed to the corporation"). Therefore, the fact that Savencia knew about Voss' tortious conduct is a reasonable inference that should have been drawn in favor of the ECB Parties. The same inference of knowledge is also supported by the allegation that Savencia Cheese supplied cheese to Schratter before and after the execution of the distribution agreement and thus had to be aware of the discounts being granted and subsequently removed. DE 31, ¶ 11.

**Third**, the Amended Complaint alleges "the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." DE 127 at 7. The Amended Complaint alleges that the co-conspirators paid millions of dollars to Voss for his role in the conspiracy. The Amended Complaint also alleges that Savencia Cheese entered into the new distribution agreement, without which there would be no relinquishment of the valuable pricing discounts in the SPA: "Working with co-conspirator Voss, Savencia Cheese *procured an intentional and unjustified breach* of the discounted pricing and rights to distribute the Savencia products for a period of ten years *by the execution of the Distribution Agreement* which changed the terms upon which Schratter would purchase Savencia products." DE 31, ¶ 146.

Even though the foregoing establishes that Savencia Cheese had knowledge of the fiduciary relationship and wrongful act, the district court incorrectly stated

49

that "[t]o the contrary, Plaintiffs acknowledge that Voss was employed by Schratter." Contrary to the district court's statement, the gist of the Amended Complaint is that, as repeated throughout the Statement of Facts, the co-conspirators, including Savencia Cheese, induced the ECB Parties to take Voss as a fiduciary, appoint him as president of Atlantic Ventures, and as CEO/president of Schratter, so that he would violate his fiduciary duties. Voss was employed by Schratter as CEO/president after the closing, while it was owned by the ECB Parties. This is part of the proof that the conspiracy was effective.

Based on the foregoing, the ECB Parties have "met the low bar of notice pleading, [and this Court] should reverse the district court's order dismissing its claims and remand for further proceedings consistent with this opinion." *Soho Ocean Resort TRS, LLC v. Rutois*, 21-11392, 2023 WL 242350, at *4 (11th Cir. Jan. 18, 2023).

### 3. The ECB Parties Alleged a Claim for Tortious Interference with Contract

The district court correctly identified the elements of tortious interference as "(1) the existence of a contract, (2) the defendant's knowledge thereof, (3) the defendant's intentional and unjustified procurement of a breach thereof; and (4) damages." DE 127, at 8. The ECB Parties alleged all four elements.

**First**, the Amended Complaint alleges the existence of the SPA that, among

other things, granted the ECB Parties substantial pricing discounts and rights. This is not disputed and established at length in the Statement of Facts above.

**Second**, the Amended Complaint alleges Savencia Cheese had knowledge of this provision of the SPA. DE 31, ¶ 219 ("Savencia Cheese had knowledge of the foregoing provisions of the Stock Purchase Agreement."). While knowledge is not required to be pled with specificity under Rule 9, the assertion of knowledge is also supported by the allegations that Savencia Cheese was a Delaware limited liability company, an affiliate of Zausner and Savencia, and shared the same general counsel (Gitlin) and CFO (Wild) as Savencia Companies, all as established above. *See, e.g., Id.*, ¶¶ 8, 10. The assertion of knowledge is also supported by the allegation that Savencia Cheese supplied cheese to Schratter, which clearly permits the inference that Savencia Cheese was aware of pricing. *Id.*, ¶ 11.

**Third**, the Amended Complaint alleges: "[w]orking with co-conspirator Voss, Savencia Cheese *procured an intentional and unjustified breach* of the discounted pricing and rights to distribute the Savencia products for a period of ten years by the execution of the Distribution Agreement which changed the terms upon which Schratter would purchase Savencia products." *Id.*, ¶ 146. This is the only allegation that the Court specifically found lacking, stating that the Amended Complaint failed to provide "facts from which a reasonable trier of fact could infer inducement or encouragement by Savencia Cheese." However, the Amended

Complaint also details how the co-conspirators paid Voss millions of dollars and committed to pay him millions more to be their co-conspirator and act against the interest of the ECB Parties while pretending to represent the ECB Parties interests as a fiduciary. *See id.*, ¶¶ 28, 29. Thus, even under a higher pleading standard, the allegations regarding inducement are sufficient.

Based on the foregoing, the ECB Parties have met the low bar of notice pleading. *See Soho Ocean Resort TRS, LLC,* 2023 WL 242350, at *4.

## VI.    CONCLUSION

For the foregoing reasons, the lower court's orders, DE 124 and DE 127, should be reversed.

52

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,756 words, inclusive of the Preliminary Statement, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and the Local Rules of this Court.

This document complies with the typeface requirements of Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.

By: /s/ Joel S. Magolnick
**Joel S. Magolnick, Esq.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 18, 2023, I caused this Initial Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the counsel of record.

By: /s/ Joel S. Magolnick
**Joel S. Magolnick, Esq.**